## UNITED STATED DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

### EASTERN DIVISION

|  |  |  |
|---|---|---|
| KATHERINE C. FOSTER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| WHITE HERON THEATRE COMPANY, | ) | |
| LYNNE MELILLO BOLTON, MICHAEL | ) | |
| KOPKO, LISA MELILLO, IVY SCRICCO, | ) | |
| GRANT SANDERS, and | ) | |
| SCHUYLER TILNEY, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

### Introduction

1. By this action, the plaintiff Katherine C. Foster ("Ms. Foster") seeks to recover wages

that are long past due her under an employment agreement dated September 5, 2015. As

set forth below, the defendant White Heron Theatre Company ("White Heron" or "the

Company") hired Ms. Foster to serve as its Development Director as the Company

undertook to launch its first capital campaign. Ms. Foster worked diligently with White

Heron, its officers, directors, advisors, and managing agents to lay the groundwork for a

successful capital campaign and to address a myriad of other fundraising needs as

requested. Nevertheless, the defendants failed and/or refused to pay Ms. Foster for all

but a small fraction of her work, leaving over $207,000.00 still due and owing. The

defendants' conduct not only constitutes a breach of the parties' employment agreement but also violates federal and state law, under which Ms. Foster is entitled to recover multiple damages, costs, interest, and attorneys' fees.

### The Parties

2. The plaintiff Ms. Foster is an individual residing at 344 West 87th Street, New York, New York.

3. The defendant White Heron is organized under the laws of the Commonwealth of Massachusetts as a nonprofit corporation with a principal place of business at 5 North Water Street, Nantucket, Massachusetts.

4. The defendant Lynne Melillo Bolton ("Ms. Bolton") is an individual residing at 4 Shell Street, Siasconset, Nantucket, Massachusetts. At all relevant times, Ms. Bolton served (and continues to serve) as the Founder and Artistic Director of White Heron. Ms. Bolton served as President of White Heron when Ms. Foster was first hired as White Heron's Development Director in 2015. Upon information and belief, Ms. Bolton continued to serve as the President of White Heron until May, 2016. At all relevant times, Ms. Bolton, along with Mr. Kopko, was responsible for the day to day operations of White Heron.

5. The defendant Michael Kopko ("Mr. Kopko") is an individual residing at 5 North Water Street, Nantucket, Massachusetts. At all relevant times, Mr. Kopko served and continues to serve as the Executive Director of White Heron. At all relevant times, Mr. Kopko, along with Ms. Bolton, was responsible for the day to day operations of White Heron.

6. The defendant Lisa Melillo ("Ms. Melillo") is an individual who, upon information and belief, currently resides at 3897 Corrinne Drive, Orlando, Florida. Ms. Melillo served as

the Treasurer of White Heron at the time that Ms. Foster was hired in 2015. Upon information and belief, Ms. Melillo served as White Heron's Treasurer until some time in 2016.

7. The defendant Ivy Scricco ("Ms. Scricco") is an individual residing at 97 Pinckney Street, Boston, Massachusetts. Ms. Scricco served as Chair of White Heron's Board of Advisors as of the date that Ms. Foster was hired. Ms. Scricco served in that capacity until she became President of White Heron in or about May, 2016. Upon information and belief, Ms. Scricco has served as President of White Heron from May, 2016 to the present date.

8. The defendant Grant Sanders ("Mr. Sanders") is an individual residing at 11 Dennis Drive, Nantucket, Massachusetts. Mr. Sanders served as the Secretary/Clerk of White Heron's Board of Directors at the time that Ms. Foster was hired in 2015. At some point in 2016, Mr. Sanders also began to serve as the Treasurer of White Heron. Mr. Sanders has served as White Heron's Treasurer and as its Secretary/Clerk from 2016 to the present date.

9. The defendant Schuyler Tilney ("Mr. Tilney") is an individual residing at 5922 Shady River Drive, Houston, Texas. Mr. Tilney served as a member of White Heron's Board of Advisors from around the time that Ms. Foster was hired in 2015 until May, 2016, when he was elected to serve on White Heron's Board of Directors. Mr. Tilney served as the Chair of the Finance Committee of White Heron's Board of Advisors and, upon information and belief, has served in that same capacity on White Heron's Board of Directors from and after May, 2016.

10. In their respective capacities as President and Treasurer of White Heron, defendants Ms.
Bolton, Ms. Scricco, Ms. Melillo, and Mr. Sanders are, by virtue of their offices,
individually liable for violations of the Massachusetts Wage Act pursuant to G.L.c. 149,
§ 148.

11. At all relevant times, defendants Ms. Bolton, Mr. Kopko, Ms. Scricco, and Mr. Tilney
were (and continue to be) officers and/or agents "having the management" of White
Heron within the meaning of the Massachusetts Wage Act, G.L. c. 149, § 148.

    a. At all relevant times, Ms. Bolton and Mr. Kopko were jointly responsible for
the day to day operations of White Heron, and for the development of policies
that govern those operations. Among other things, they were jointly
responsible for making hiring decisions on behalf of White Heron, including
the decision to hire Ms. Foster, and they had specific decision-making
authority concerning the payment of wages, including decisions concerning
the payment (and non-payment) of wages to Ms. Foster. At all relevant times,
Ms. Bolton and Mr. Kopko had direct supervisory authority over Ms. Foster's
work. Ms. Bolton and Mr. Kopko were the individuals primarily responsible
for assigning work to Ms. Foster, and as such, were the individuals who
primarily determined the nature and scope of Ms. Foster's work.

    b. As Chair of White Heron's Board of Advisors and then as President of White
Heron, Ms. Scricco exercised oversight responsibility in connection with Ms.
Foster's work for White Heron. Ms. Scricco worked directly with Ms. Foster
throughout the course of Ms. Foster's employment and assigned work to Ms.

Foster in connection with White Heron's fundraising, board development, and organizational development efforts.

    c.  As Chair of White Heron's Finance Committee, Mr. Tilney assumed and accepted management responsibility in the area of White Heron's finances, including the proper reporting of White Heron's financial information. As Chair of White Heron's Finance Committee, Mr. Tilney controlled, directed, and participated to a substantial degree in formulating and determining White Heron's financial policies and practices. Mr. Tilney worked directly with Ms. Foster and requested her participation in his efforts to reorganize White Heron's financial management and reporting practices, so as to produce accurate and defensible financial statements and establish organizational credibility with donors, prospects, and the larger community served by White Heron.

As such, each of these defendants is a managing agent of White Heron with individual liability for White Heron's violation of the Massachusetts Wage Act pursuant to G.L.c. 149, § 148.

12. At all relevant times, defendants Ms. Bolton, Mr. Kopko, Ms. Scricco, and Mr. Tilney had substantial authority to make decisions concerning the allocation of White Heron's financial resources and each was instrumental in White Heron's refusal to pay Ms. Foster for any of the work she performed from and after November 15, 2015. As such, and as set forth more fully below, each of these defendants was instrumental in causing White Heron to violate the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* on account of White Heron's nonpayment of wages to Ms. Foster. Accordingly, each of these

defendants is individually liable for White Heron's violation of the Fair Labor Standards
Act pursuant to 29 U.S.C. § 203(d).

## Jurisdiction and Venue

13. The Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) because
the amount in controversy exceeds $75,000.00 and because the plaintiff is a citizen of a
different state than each of the defendants.

14. The Court also has original jurisdiction of this action pursuant to 28 U.S.C. § 1331, in
that Ms. Foster has brought a claim arising under federal law, namely, the Fair Labor
Standards Act, 29 U.S.C. §§ 201 *et seq.*

15. The Court has pendent jurisdiction of Ms. Foster's state law claims pursuant to 28 U.S.C.
§ 1367.

16. Venue is proper within this District and Division pursuant to 28 U.S.C. §1391 because
the events giving rise to Ms. Foster's claims primarily occurred within this District and
Division and because White Heron and several of its managing agents may be found
within this District and Division.

## Statement of Facts

### A. The Employment Agreement

17. In July, 2015, White Heron's Founder, President, and Artistic Director, Lynne Bolton
reached out to Ms. Foster to seek her advice. Ms. Bolton knew Ms. Foster to be an
experienced and accomplished development professional via the association that Ms.
Bolton and her husband had with the New York City Ballet during the years in which Ms.
Foster had served as the Ballet's Director of Development.

18. Ms. Bolton told Ms. Foster that White Heron was in the process of "building a new theatre building and running a $7 million capital campaign." Ms. Bolton explained that White Heron needed someone to help it "kick off the capital campaign" and to "set the strategy for the future in development for the company." See, **Exhibit A.**

19. On July 30, 2015, at Ms. Bolton's request, Ms. Foster met with Ms. Bolton to hear more about White Heron's development needs and to offer Ms. Bolton her thoughts.  In the course of the meeting, Ms. Bolton asked Ms. Foster if she would consider helping White Heron with its capital campaign.

20. With some reservations, given that the project had already been launched without the prior strategic planning and groundwork typical of a successful capital campaign, Ms. Foster agreed to consider it.

21. In response, Ms. Bolton sent Ms. Foster the campaign development materials that then existed, so that Ms. Foster could make an assessment of White Heron's needs; could consider whether it made sense for her to work on the project; and could think about the possible terms under which she would provide services.

22. On August 12, 2015, Ms. Foster sent Ms. Bolton an email that offered her preliminary thoughts about how White Heron should approach its fundraising needs. See, **Exhibit B.**

23. Given that construction had already begun on the new theater building before any capital campaign planning had occurred and before any leadership commitments had been secured (contrary to basic principles of sound campaign planning), Ms. Foster noted White Heron's "short horizon" to raise funds, and advised that the effort begin as soon as possible, focusing on the following priorities to make up for lost time:

o Revising the case statement to be current and to include elements that would be persuasive to the varying interests of lead prospects and to the broader community that White Heron might serve going forward. This was particularly important because, in Ms. Foster's view, the materials that White Heron had developed so far were completely deficient for this purpose and stood no chance of presenting a credible case to raise millions of dollars, whether from major donors or otherwise;

o Developing and qualifying White Heron's prospect list to assess specific gift potential among those with whom the Company already had some connection and to determine additional prospect outreach that would be needed to meet the financial objectives for the campaign;

o Developing a campaign strategy, timeframe, and estimated budget that identified decisions that would likely be needed along the way, but that allowed fundraising to proceed as soon as possible in a serious and organized way; and

o Moving forward with approaches to top prospective donors beginning with those who had indicated their receptivity to making major gifts, focusing first on the one or two leadership gifts that would set the pace. See, **Exhibit B.**

24. In her email of August 12, 2015, Ms. Foster did not assume that she would be the person that White Heron would hire to assist it in addressing these priorities. Ms. Foster did, however, share her thoughts about what would work best, both for her and for White Heron, in the event that White Heron wanted to work with her:

- In light of the various registration and other requirements that applied to outside consultants, Ms. Foster advised that "the simplest way for us to work together would be for WH to hire me directly as a temporary employee."

- For discussion purposes, Ms. Foster outlined a variety of compensation models that she and other development professionals had used in the past. Given White Heron's particular needs, Ms. Foster recommended that White Heron simply pay her based upon time worked, at an hourly rate of $175, consistent with industry standards for shorter-term engagements of this nature.

- In light of the time constraints of the project and the great deal of work that had to be completed, Ms. Foster offered a variety of payment options, which included a "stretch" payment plan to help White Heron manage its cash flow, especially during a period in the near term when the work needed was extensive. Under the proposed "stretch" payment plan, White Heron would make regular payments to Ms. Foster according to a fixed schedule and at agreed caps for each work period. Any remainder due would then be paid over time in regular intervals. See, **Exhibit B.**

25. On August 17, 2015, Ms. Bolton responded to Ms. Foster's August 12, 2015 email, stating that she and Mr. Kopko had reviewed Ms. Foster's ideas and were "thrilled" with them. Ms. Bolton asked Ms. Foster to send her a more formal proposal "right away." See, **Exhibit B.**

9

26. On August 31, 2015, Ms. Bolton invited Ms. Foster to come to Nantucket for White Heron's September 8, 2015 Board of Advisors meeting[1] and to do some work together. Before their working arrangement had been reduced to writing, but trusting Ms. Bolton's good faith, Ms. Foster traveled to Nantucket and spent four days, at White Heron's request, working on the priorities she had outlined in her email of August 12, 2015.

27. During those four days on Nantucket, Ms. Foster worked extensively with Ms. Bolton and Mr. Kopko; met with selected key stakeholders (including Ms. Scricco and Mr. Sanders); interacted with other members of White Heron's Board of Advisors and with audience members, actors, and technical staff; attended and made a presentation at the September 8, 2015 Board of Advisors meeting; conducted a preliminary examination of the White Heron patron/donor database; and began conducting prospect research.

28. At the meeting of White Heron's Board of Advisors on September 8, 2015, Ms. Foster was introduced as White Heron's "new development Director. [sic]." **Exhibit C**.

29. On September 10, 2015, in response to Ms. Bolton's request, Ms. Foster submitted a detailed employment proposal to Ms. Bolton and Mr. Kopko that included an outline of the scope of work to be performed, a draft employment contract, and a sample payment schedule illustrating how the "stretch" payment plan would work. See, **Exhibit D**.

30. On September 16, 2015, Ms. Foster met with Ms. Bolton and Mr. Kopko in New York. They discussed the proposal that Ms. Foster had submitted on September 10, 2015 and

---

[1]     At the time, White Heron had both a Board of Directors and a Board of Advisors. The Board of Advisors was an advisory body that actively guided White Heron in making major decisions affecting its operations. In or about May, 2016, the Board of Advisors effectively merged with the Board of Directors. At that time, the Board of Directors voted to elect all sitting members of the Board of Advisors to the Board of Directors.

agreed to go forward on the terms that Ms. Foster had proposed. They also agreed to a

start date of September 6, 2015 in order to capture the time that Ms. Foster had spent and

the expenses that she had incurred in connection with the four-day trip to Nantucket

earlier that month.

31. During this meeting, Ms. Foster provided Ms. Bolton and Mr. Kopko with a signed W-4

form and a draft expense report template to be used for campaign expenses.

32. On September 17, 2015, Ms. Foster sent Mr. Kopko a copy of the employment agreement

that the parties had approved the day before with a corrected signature line. She also sent

him confirmation of her mailing address for purposes of White Heron's employment

records and direct deposit bank information for White Heron's payroll. See, **Exhibit E.**

33. Although the parties made minor changes to the employment agreement thereafter, Mr.

Kopko finally signed the agreement and delivered it to Ms. Foster in late November,

2015. The parties' fully signed employment agreement is attached hereto as **Exhibit F.**

**B. Ms. Foster's Work for White Heron**

34. Ms. Foster worked diligently for White Heron from September 6, 2015 to August 26,

2016. Throughout, she brought a level of professionalism and experience that White

Heron sorely needed in its efforts to raise funds.

35. In the course of the work she performed for White Heron, Ms. Foster, among other

things:

- Took pains to educate White Heron's senior management, Board of Advisors, and
  Board of Directors about the process and the leadership commitment necessary
  for a successful capital campaign;

- Guided White Heron's senior management, Board of Advisors, and Board of Directors in considering the scope of the campaign, and in relying upon realistic, fact-based evidence for its goals;

- Worked carefully to obtain buy-in from senior management and stakeholders at all steps in the process, which involved, among other things, securing the commitment from members of White Heron's Board of Advisors and Board of Directors to (a) 100% participation in their financial support of the campaign, and (b) their active engagement in identifying and opening doors to potential lead donors;

- Developed a thoughtful capital campaign strategy that was flexible enough to change in response to the Company's evolving and expanding needs;

- Developed a compelling case statement, based on White Heron's artistic vision and on fact-based projections of financial needs, to guide senior management and Board members in their solicitation of prospective donors;

- At White Heron's direction, worked closely with TDC, the consulting firm that White Heron had retained to produce its strategic business plan, to support the development of the business plan and to make sure that TDC's efforts produced the financial data necessary to substantiate the case for the capital campaign;

- Recommended several graphic designers who could produce White Heron's capital campaign brochure, and then worked extensively with the designer of White Heron's choice to develop a product that was accurate and inviting, and that met White Heron's specifications;[2]

- Analyzed and corrected data that White Heron had for existing donors and patrons, and undertook considerable independent research to identify and qualify these and other prospective donors; produced a vetted list of 200 high potential prospects that was circulated to the Board of Advisors and Board of Directors for their comment and input; and created approximately 90 prospect profiles, adding critical new information to the database in the process;

- Prepared prospect strategy documents and correspondence to secure meetings with prospective lead donors;

- Managed two prospect cultivation events (one in Washington, D.C. and one in Boston) for pre-qualified prospective donors and other prospects who had been qualified through the event planning process; and

- Assisted White Heron as requested with several other fundraising and related efforts, including providing an assessment of database functionality for prospect

---

[2]     Upon information and belief, White Heron has also failed and/or refused to pay its designer for the work she did to produce the campaign brochure.

management and gift reporting; developing data entry/management protocols to be used going forward; advising on the strategic development and execution of its annual Fall Appeal; advising on the pricing and marketing strategy for a benefit event it held in July, 2016; and advising on the pursuit of various grant opportunities. Ms. Foster also provided input on development-related and other content for White Heron's new website.

36. With respect to White Heron's fundraising efforts, Ms. Foster performed all of the work that White Heron asked her to do, including completion of all of the groundwork necessary to place White Heron in a position to credibly and effectively solicit prospective capital campaign donors – groundwork that normally takes skilled development professionals, at minimum, well over one year.

37. Ms. Foster was able to make this progress in the face of surprising odds.

- When she began the process of gathering facts necessary to develop and present a coherent campaign strategy, Ms. Foster found White Heron's administrative and financial records, including its patron/donor database, to be in considerable disarray.

- Even more troubling, as Ms. Foster's work continued, White Heron's senior management showed no appreciation for the need for timely and accurate data or for timely follow-through. During the initial phases of the capital campaign, which involved the development of campaign goals and strategy, these problems required Ms. Foster to perform significant extra work. During the donor solicitation phase of the capital campaign, senior management's lack of follow through meant that, despite Ms. Foster's advice and encouragement, critical prospective donors were neither contacted nor cultivated.

**C. Ms. Foster's Requests for Payment and White Heron's Response**

38. Notwithstanding Ms. Bolton's initial eagerness to finalize the terms of the employment relationship 'right away" (per her email of August 17, 2015, attached as **Exhibit B**), White Heron did not manage to sign the employment agreement until November, 2015. It did so only after Ms. Foster had made several specific requests for the signed document, including inquiries made on September 24, October 19, and November 13, 2015.

39. Before receiving the signed document, Ms. Foster had to repeatedly send and re-send information to Mr. Kopko, and to remind him of the information she had previously sent.

40. In an email dated November 13, 2015, Ms. Bolton apologized for the delay and assured Ms. Foster that the agreement would be signed and sent to her, along with payment for the work she had performed.  See, **Exhibit G.**

41. On November 21, 2015, after receiving confirmation from Ms. Bolton that the employment agreement would be returned to her with Mr. Kopko's signature, Ms. Foster sent White Heron work reports detailing the time she spent and the work she performed on White Heron's behalf from September 6, 2015 to November 15, 2015.  See, **Exhibit H.**

42. It was not until December 21, 2015 – a full month later – that White Heron sent a partial payment to Ms. Foster for the work she had performed through November 15, 2015.  See, **Exhibit I.**  During this timeframe, Ms. Foster had to contact Mr. Kopko repeatedly to inquire about when she could expect to be paid for her work, and to send and re-send direct deposit and other information to ensure that the payment would be processed.  See, **Exhibit I.**

43. By that time, Mr. Kopko informed Ms. Foster that White Heron was switching payroll systems, and that the earliest that Ms. Foster could be added to the new payroll system was January 1, 2016.  Mr. Kopko informed Ms. Foster that, after the new payroll system was in place, White Heron would be paying her on a weekly basis.  See, **Exhibit I.**

44. In fact, Ms. Foster received no further payment from White Heron until May, 2017, when, in response to a demand letter sent by Ms. Foster's counsel, White Heron sent her the remaining amount due for the work she had performed through November 15, 2015,

with 4% interest, less deductions required by law, plus reimbursement for the expenses she had incurred.

45. White Heron paid Ms. Foster nothing, however, for the extensive work she performed for White Heron – with White Heron's full knowledge and at its request – after November 15, 2015.

46. Given that, according to Mr. Kopko, Ms. Foster would not be placed on the White Heron payroll until January, 2016, Ms. Foster waited until the third week of January to submit work reports reflecting the work she had performed for White Heron from November 16, 2015 through mid-January. See, **Exhibit J**.

47. Ms. Foster heard nothing from White Heron in response to this submission of work reports and received no further payment.

48. In a meeting with Ms. Bolton on March 31, 2016, Ms. Foster asked about the status of payment for the work she had performed from mid-November, 2015 to mid-January, 2016. Ms. Bolton told Ms. Foster that she would look into it. Neither Ms. Bolton nor Mr. Kopko provided Ms. Foster with any further information about the status of the outstanding payment due.

49. Nevertheless, continuing to trust Ms. Bolton's and Mr. Kopko's good faith, Ms. Foster continued to perform work for White Heron as requested in connection with its capital campaign and other fundraising needs.

50. On July 25, 2016, Ms. Foster submitted work reports reflecting work performed for White Heron through March 27, 2016. She included a schedule showing how much was due under the "stretch" payment plan, and a report of her expenses through June, 2016.

See, **Exhibit K.** Ms. Foster received no response from White Heron, and received no

payment for her work.

51. On October 11, 2016, Ms. Foster submitted work reports for the remainder of her work

for White Heron (through August, 2016). See, **Exhibit L.**  In November, 2016 and again

in February, 2017, Ms. Foster sent follow up reports and schedules showing the amounts

still due and owing under the "stretch" payment plan.  See, **Exhibits M and N.**  Ms.

Foster received no response from White Heron and received no payment for her work.

52. On December 1, 2016, Ms. Bolton sent an email to Ms. Foster demanding, for the first

time, that Ms. Foster format her work reports differently, stating that, in order to receive

payment, Ms. Foster provide her with "an itemized breakdown, by the hour, of all work

billed to White Heron Theatre," including "the task, date, your location, and specific

work product produced by the hour."  Ms. Bolton also stated that Ms. Foster "may use

the quarter hour legal billing cycle," "by breaking down the billing to quarter hour (15

minute) increments, if helpful, so as to be more specific on work product."

53. Ms. Bolton made this demand for specificity notwithstanding that Ms. Foster's prior

work reports had been accepted without question or comment.  Ms. Bolton also made this

demand for specificity notwithstanding the fact that, throughout the employment

relationship, she and Mr. Kopko had been in continuous (often daily) communication

with Ms. Foster about her work for White Heron, and that, as a result, knew exactly what

work Ms. Foster was performing on White Heron's behalf and when.

54. Ms. Foster, whose work reports to White Heron were, in fact, based on contemporaneous

notes she had kept as her work progressed, explained that she had structured her work

reports the way she had because so much of the work was of a continuous nature that

notation by the hour, or even by the day, would have resulted in repetitive entries that would have been much longer and more difficult to review. (In fact, had Ms. Foster billed White Heron on the quarter-hour basis that Ms. Bolton demanded, Ms. Foster's time charges would have been higher.) Despite Ms. Foster's explanation, no payment was forthcoming.

55. Between September 6, 2015 and August 26, 2016, Ms. Foster worked a total of 1,524.25 hours on White Heron's behalf at the agreed rate of $175 per hour, for a total amount owed of $266,743.75. The total estimated costs for White Heron's capital campaign was $535,000.00. Ms. Foster completed the groundwork for White Heron's capital campaign, and provided many other fundraising services in addition to that, for less than half of that amount.

56. Of the $266,743.75 that was due to Ms. Foster, White Heron has, as of May 17, 2017, paid only $58,800.00, leaving $207,943.75 still due and owing.

### Statement of Claims

### Count I: Breach of Contract
### (Against White Heron)

57. Ms. Foster repeats the allegations set forth in Paragraphs 1 through 56, and, by this reference, incorporates them herein.

58. Ms. Foster performed all of the material terms of the employment agreement by providing all of the expert fundraising services that White Heron requested of her.

59. White Heron has breached its obligations under the employment agreement by failing and/or refusing to pay Ms. Foster for the services she provided on and after November 16, 2015.

60. By its conduct as set forth above, Ms. Foster has suffered loss and damage for which White Heron is liable.

**Count II:  Violation of the Massachusetts Wage Act, G.L. c. 149, §§ 148, et seq.**
**(Against White Heron and All Individual Defendants)**

61. Ms. Foster repeats the allegations set forth in Paragraphs 1 through 60, and, by this reference, incorporates them herein.

62. Ms. Foster is an "employee" of White Heron as that term is defined by the Massachusetts Wage Act, G.L. c. 149, §§ 148, et seq. ("the Wage Act").

63. White Heron is a "person having employees in its service" as that term is defined by the Wage Act.

64. By its conduct as set forth above, White Heron has violated the Wage Act.

65. The individual defendants Ms. Bolton, Mr. Kopko, Ms. Melillo, Ms. Scricco, Mr. Sanders, and Mr. Tilney are "officers or agents having the management of" White Heron as that term is defined by the Wage Act, and as such, each has individual liability for White Heron's Wage Act violations.

66. The defendants' failure and/or refusal to pay Ms. Foster for the work she performed on White Heron's behalf was and is willful.

67. By their conduct as set forth above, Ms. Foster has suffered loss and damage for which the defendants are jointly and severally liable.

68. Ms. Foster has timely filed a Complaint with the Office of the Attorney General for the Commonwealth of Massachusetts, and has received a "right to sue" letter.  See, **Exhibit O**. She has, accordingly, satisfied all prerequisites to filing a private right of action under the Wage Act.

**Count III:  Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.***
**(Against White Heron, Ms. Bolton, Mr. Kopko, Ms. Scricco and Mr. Tilney)**

69. Ms. Foster repeats the allegations set forth in Paragraphs 1 through 68, and, by this reference, incorporates them herein.

70. Ms. Foster is an "employee" within the meaning of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA").

71. White Heron, Ms. Bolton, Mr. Kopko, Ms. Scricco, and Mr. Tilney each fall within the definition of an "employer" under 29 U.S.C. § 203(d).

72. By their conduct as set forth above, the defendants have violated FLSA.

73. By their conduct as set forth above, the defendants' violation of FLSA was willful.

74. As a result of the defendants' conduct as set forth above, Ms. Foster has suffered loss and damage for which the defendants are jointly and severally liable.

**Count IV:  Quantum Meruit**
**(Against White Heron)**

75. Ms. Foster repeats the allegations set forth in Paragraphs 1 through 74, and, by this reference, incorporates them herein.

76. From September 6, 2015 to August 26, 2016, Ms. Foster provided White Heron with extensive professional development services at White Heron's ongoing request.

77. White Heron agreed to pay Ms. Foster $175 per hour for these services, a rate that was within standard rates in the industry at the time for shorter term engagements of this nature.

78. White Heron received the benefit of Ms. Foster's professional development services, but has refused to pay her therefor.

79. The outstanding amount still owed to Ms. Foster - $207,943.75 – represents exceptional value for the work that Ms. Foster performed, and is fully fair and reasonable for the services rendered.

80. White Heron is responsible for paying Ms. Foster $207,943.75 as the reasonable value for the work that she performed on White Heron's behalf and at its request.

### Count V: Declaratory Judgment Pursuant to 28 U.S.C § 2201
### (Against White Heron and All Individual Defendants)

81. Ms. Foster repeats the allegations set forth in Paragraphs 1 through 80, and, by this reference, incorporates them herein.

82. A controversy exists between Ms. Foster and the defendants concerning the defendants' obligation to pay her for the services she rendered to White Heron.

83. A declaration of the rights and obligations of the parties pursuant to 28 U.S.C. § 2201 will be instrumental in resolving the controversy.

### **Requests for Relief**

WHEREFORE, Ms. Foster requests that this Court:

1. Enter judgment in Ms. Foster's favor on all Counts of the Complaint;

2. Issue a declaration that each of the defendants are jointly and severally liable for the payment to Ms. Foster in the amount of $207,943.75 as the amount still due and owing under the employment agreement;

3. Issue a declaration that White Heron is liable for the payment to Ms. Foster in the amount of $207,943.75 as the reasonable value of the services that she provided to White Heron;

4.  Order that the defendant White Heron and/or each of the individual defendants, pay Ms. Foster in the amount of $207,943.75 as the amount still due and owing under the parties' employment agreement;

5.  Order that the defendant, White Heron, pay Ms. Foster in the amount of $207,943.75 as the reasonable value of the services that she provided;

6.  Order that White Heron and/or each individual defendant pay Ms. Foster treble damages as required by the Wage Act;

7.  Order that White Heron and/or defendants Ms. Bolton, Mr. Kopko, Ms. Scricco and Mr. Tilney pay Ms. Foster multiple damages as required by FLSA;

8.  Award Ms. Foster interest and costs as allowed by law;

9.  Award Ms. Foster the reasonable attorneys' fees she was forced to incur in order to obtain payment of wages under the Wage Act and FLSA; and

10. Grant such other relief as the Court deems just.

Respectfully submitted,

KATHERINE C. FOSTER

By her attorneys,

/s/Anne L. Josephson
Anne L. Josephson
BBO # 254680
ajosephson@kcslegal.com
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA   02114
Tel: 617-227-7031
Fax: 617-367-2988

John D. Frumer
BBO #546695
jdfrumer@christieyoung.com
CHRISTIE & YOUNG, P.C.
199 Wells Avenue, Suite 301
Newton, MA 02459
Tel: 617-854-8315
Fax: 617-854-8311

**Jury Demand**

**THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**